**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

MORRIS WILLIAMS,        §
                                     §
            Plaintiff          §
                                     §
    v.                             §     Case No. 4:25-cv-04729
                                     §
EQUIFAX INFORMATION SERVICES,    §
LLC,                                §
                                     §
          Defendant.       §
                                     §

**DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND MEMORANDUM IN SUPPORT**

Defendant Equifax Information Services, LLC' ("Equifax"), pursuant to Federal Rule of Civil Procedure 12(c), files this Motion for Judgment on the Pleadings and Memorandum in Support (the "Motion") and respectfully shows the Court as follows:

The Motion should be granted in this case where *pro se* Plaintiff wrongly claims that Equifax violated the Fair Credit Reporting Act ("FCRA") when it provided a full disclosure of Plaintiff's credit file upon his request that included truncated account numbers because:

A.      Equifax's consumer disclosures provide a clear and accurate depiction of the information in Plaintiff's consumer file and provides Plaintiff with clarity to compare the information included in his file;

B.      Statutes identify the protection of consumer financial information and consumers' privacy to be a guiding principle of all aspects of the financial and credit industries;

C.      Courts should interpret the requirements of the FCRA consistent with consumer reporting agencies' obligations under voluminous other privacy laws and regulations;

D.      Plaintiff's allegations are conclusory and do not state a claim;

E.    Case law holds that Equifax cannot have acted with a conscious disregard of Plaintiff's rights pursuant to the FCRA because its actions were necessitated by its compliance with other privacy laws; and

F.    Case law holds Plaintiff cannot prove a negligent violation of the FCRA because Plaintiff does not and could not have any actual damages in connection with receiving truncated account information.

## I.    <u>INTRODUCTION</u>

*Pro se* Plaintiff Morris Williams ("Plaintiff") brings this action against Equifax under the misplaced belief that Equifax violated the FCRA by providing Plaintiff with truncated account numbers in response to Plaintiff's request for a copy of his complete Equifax credit file. *See generally*, ECF No. 1. Equifax (and the entire credit reporting industry) only transmits truncated account numbers on consumer disclosures provided to consumers. However, such an action does not result in a violation of the FCRA – or any other law. Equifax's (and, in fact, the entire credit reporting industry's)[1] truncation of account numbers complies with the requirements and purposes of the many other laws and the underlying purpose of the FCRA – to protect consumer privacy and credit information from third parties – while also allowing consumers to identify and understand the information on their individual credit files for the purposes which the FCRA provides. Additionally, because Equifax acted with an intent to protect Plaintiff's privacy, Plaintiff cannot show a willful violation of the FCRA and Plaintiff will be unable to show any actual damages because of receiving his consumer disclosure, as required to succeed on an FCRA claim.

---

[1] Other consumer reporting agencies, some affiliated with Equifax and many that are not, are also defending against these same baseless claims – making the scale for the Courts to handle these alleged violations enormous on already crowded dockets. The industry standard, as evident from entries on some consumer reporting agency websites, is to truncate account numbers to protect consumers from fraud and other unwanted, third party access to their financial information.

Finally, it should be noted that Plaintiff's theory of liability under 1681g is not limited to either this consumer or this jurisdiction. To date, Equifax believes that it has already been served with *dozens* of complaints which are strikingly similar and which make this same, baseless argument. In the majority of cases, much like this one, the plaintiffs are willing to settle, not for untruncation of account numbers, but financial return and the removal of otherwise accurate, but negative, credit history. In other words, Equifax believes these lawsuits are brought for the improper purpose of credit repair.[2] Equifax is concerned about the legal implications if this court were to hold that account numbers on consumer disclosures are required to untruncated as such would conflict with industry standards and rules as well as potentially impact the privacy and security relating to the financial information of millions of American consumers.

## II.    STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings is analyzed the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Doe v. Myspace, Inc.*, 528 F. 3d 413, 418 (5th Cir. 2008) (citing *Johnson v. Johnson*, 385 F. 3d 503, 529 (5th Cir. 2004)). A court has authority to dismiss a suit for failure to state a claim upon which relief can be granted if the complaint clearly demonstrates that the plaintiff cannot prove any set of facts that would entitle it to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Power Entm't, Inc. v. Nat'l Football League Prop, Inc.*, 151 F. 3d 247, 249 (5th Cir. 1998). Federal rules require a plaintiff to articulate facts, when accepted as true, that show that the plaintiff has stated a claim entitling him to relief, i.e., the plausibility of entitlement of relief. *Bell Atl. v. Twombly*, 550 U.S. 544, 557 (2007). In addition to the Complaint, the Court can consider any documents attached to the complaint as

---

[2] Equifax is entitled to recover its attorneys' fees in such event pursuant to 15 U.S.C. § 1681n(c).

exhibits or incorporated into the Complaint by reference. *Collins v. Morgan Stanley Dean Witter*, 224 F. 3d 496, 498-99 (5th Cir. 2000).

To withstand a Rule 12(b)(6) or 12(c) motion, a complaint and its exhibits must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). When considering a motion dismissing a complaint for failure to state claim, courts should accept all well-plead facts in the complaint as true and draw all inferences in the plaintiff's favor. *Id.* However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (internal quotation omitted); *Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003). Rather, to avoid dismissal, a "plaintiff must plead specific facts, not merely conclusory allegations . . . ." *Carter v. Diamond URS Huntsville, LLC*, 175 F. Supp. 3d 711, 731 (S.D. Tex. 2016); *Aztec Oil & Gas, Inc. v. Fisher*, 152 F. Supp. 3d 832, 839 (S.D. Tex. 2016). In other words, a plaintiff must plead a "plausible claim for relief" – one where the claim affirmatively shows "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although *pro se* complaints are held to a less stringent standard, courts are not required to overlook a *pro se* plaintiff's complaint that does not provide any factual basis for his claims. *See Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). When considering a motion to dismiss for failure to state a claim, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Id.* (internal quotation omitted). "In such circumstances, the Court's liberal construction of the Complaint cannot override the allegations' legal implausibility." *Holloway v. Equifax*, No. 4:23-cv-01038-P, 2024 WL 2747734,

at *3 (N.D. Tex. May 29, 2024) (citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.3d 1045, 1050 (5th Cir. 1982)).

## III.    ARGUMENT AND AUTHORITIES

**A.    Equifax's Consumer Disclosure Provided A Clear And Accurate Depiction Of The Information In Plaintiff's Consumer File And Provides Plaintiff Clarity To Compare The Information In His Equifax Credit File**.

Plaintiff argues that truncating account numbers on consumer disclosures violates the FCRA because consumer reporting agencies "shall, upon request, . . . clearly and accurately disclose to the consumer . . . [a]ll information in the consumer's file at the time of the request[.]" 15 U.S.C. 1681g(a). ECF No. 1 at ¶ 12. Congress has not defined "clearly and accurately" and there does not appear to be a legal standard for assessing the statutory language of "clear and accurate" *See Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007); *see also Parker v. Equifax Info. Servs., LLC*, Case No. 2:15-cv-14365, 2017 WL 4003437, *4-5 (E.D. Mich. September 12, 2017) (noting that the "legal standard for assessing the type of claim alleged here has not been developed…and the Plaintiff does not offer a standard by which the Court may review whether a disclosure was "clear and accurate" within the meaning of §1681g). However, what is clear is that the purpose behind § 1681g is to allow the consumer to compare the information in the credit file with their own personal information. *See Wilson v. Equifax Info. Servs.*, Case No. 2:19-cv-00055, 2020 WL 2771184, *6 (D. Nev. May 27, 2020); *see also Gillespie*,484 F.3d at 941 ("The disclosure must be made in a manner sufficient to allow the consumer to compare the disclosed information from the credit file against the consumer's personal information in order to allow the consumer to determine the accuracy of the information set forth in her credit file").

Here, the purpose of §1681g has been satisfied – Plaintiff was certainly able to identify potential inaccuracies in his credit file as they have been identified in the Complaint and exhibits. *See* ECF No. 1  at ¶ 14; ECF No. 1-2 at Ex. C.  In any event, it is important to further discuss the

interpretation of §1681g in the context of truncation. The interpretation of "clear and accurate", should be determined by looking at the FCRA in the context of the credit reporting industry's rules and standards as well as other related statues regarding consumer protection, privacy and security measures. As discussed below, once the provisions of §1681g are read in conjunction with its stated purpose in the context of the entire financial and credit reporting industry and statutes regulating Equifax and the other CRAs, it is a necessary conclusion that truncation of account numbers does not violate the FCRA and, as a result, Plaintiff's claims fail.

**B.** **Statutes Identify The Protection Of Consumer Financial Information And Consumers' Privacy To Be A Guiding Principle Of All Aspects Of The Financial And Credit Industries.**

As noted above, Plaintiff baldly alleges that truncating account numbers on consumer disclosures violates §1681g because truncation fails to "clearly and accurately disclose to the consumer….all information in the consumer's file." ECF No. 1 at ¶ 12. However, protecting consumer financial information is not a violation of the FCRA.  Section 1681g must be read in the light of the overarching, primary purpose of the FCRA: the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. 1681a(4). Plaintiff alleges in his own Complaint that Equifax has such an obligation to protect his right to privacy. ECF No. 1 at ¶ 3. As discussed above, there is no basis for the claim that truncation of account numbers makes the information provided inaccurate in any way, nor is it reasonable to believe that it is unclear – especially when the consumer can review each tradeline as a whole.  *See, e.g, Bibbs v. Trans Union LLC*, 43 F.3d 331, 343-344 (3rd Cir. 2022) (stating the clarity and accuracy of a tradeline must be determined by reviewing the tradeline as a whole, not just a single data entry).

The entire consumer finance and consumer credit industries are bound by one, overarching restraint:  consumer information, especially financial-related information, must be protected from

disclosure to unauthorized individuals and entities. As a consumer reporting agency ("CRA") storing billions of pieces of private consumer financial information as well as personal identifying information, Equifax is similarly tasked with ensuring the privacy and protection of consumers and their financial information. Equifax, as well as the other major CRAs, truncates consumer account numbers to protect the privacy of individual consumers and prevent identity theft.

Specifically, truncation of account numbers is consistent with almost all federal privacy laws. The Gramm-Leach-Bliley Act ("GLBA") was created to mandate that financial institutions have "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C.A. § 6801. The GLBA dictates that financial institutions should establish safeguards to "ensure the security and confidentiality of customer records and information; protect against any anticipated threats or hazards to the security or integrity of such records; and protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer." *Id.* The federal regulations establish a "general prohibition on disclosure of account numbers. [Financial institutions] must not, directly or through an affiliate, disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a consumer's credit card account, deposit account, or transaction account to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer." 16 C.F.R. § 313.12. When discussing the language of the GLBA, "Representative Jackson–Lee added that "[t]his account [number] information is especially sensitive and should be kept as confidential as possible." 145 Cong. Rec. H5315 (daily ed. July 1, 1999). *Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 33 (D.D.C. 2001), *aff'd sub nom. Trans Union LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002).

In accordance with the GLBA, credit card companies created requirements for all entities it deals with called the Payment Card Industry Data Security Standards ("PCI DSS"). PCI DSS is a set of "technical and operational requirements…developed to encourage and enhance payment account data security and facilitate the broad adoption of consistent data security measures globally." *PCI DSS: Requirements and Testing Procedures*, v4.0.1, 1 (2024). Two of the twelve principles requirements of PCI DSS are (1) Protect Stored Account Data and (2) Protect Cardholder Data with Strong Cryptography During Transmission Over Open, Public Networks. Id. The PCI DSS applies to "all entities that store, process, or transmit cardholder data ("CHD") and/or sensitive authentication data ("SAD") or could impact the security of the cardholder data and/or sensitive authentication data." *Id*. at 4. CHD refers to the primary account number ("PAN"), cardholder name, expiration date, or service code. *Id*. The PCI DSS is contractually enforced between card brands and entities storing, processing, or transmitting CHD.

To comply with PCI DSS, PANs must be rendered unreadable by any of the following methods: encryption, truncation, masking, or hashing. *Id*. at 74. The purpose of truncation is to "protect the data if an unauthorized individual gains access to stored data by taking advantage of a vulnerability or misconfiguration of an entity's primary access control." *Id*. at 90. Failure to truncate PANs will result in violations of PCI DSS and the entity will be subject to serious fines. Failure to comply with the PCI DSS will result in a fine ranging from $5,000 to $100,000 per month depending on the length of the company's non-compliance period. *See* Subabrata, *PCI DSS Fines: How Much Will It Cost?*, Sprinto (Oct. 10, 2024), https://sprinto.com/blog/pci-dss-fines-/#causes-of-pci-fines-and-how-much-can-it-cost-you. For non-compliance involving a data breach, the fine can be as high as $500,000 depending on the severity of the violation. *See*

Gowsika, *All You Need to Know About PCI Non Compliance Fee*, Sprinto (Jan. 8, 2025), https://sprinto.com/blog/pci-non-compliance-fee/.

As a CRA, Equifax is subject to the PCI DSS and must adhere to its standards and Equifax is subject to the strictest compliance requirements and may be fined for failing to properly store and protect CHD by not rendering the PANs unreadable through truncation. If Equifax failed to truncate consumer account numbers it would violate its contracts with card brands and consumer financial accounts would be at risk of theft. Also, interpreting the FCRA to require untruncated accounted numbers would in essence, nullify the efforts taken by financial institutions to mitigate the risk of harm of identity theft, and contradict the purpose and goals of GLBA, aimed towards protecting consumer information and preventing full account number disclosure.

Further, the Fair and Accurate Credit Transaction Act ("FACTA"), a 2003 amendment to the FCRA, focused on implementing more responsibilities on creditors, businesses, and credit reporting agencies to protect consumer data. *See, generally*, Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108–159, 117 Stat. 1952 (2003). In further amending the FCRA in 2008, Congress intentionally required the truncation of credit card account numbers in the context of credit receipts. *See* 15 U.S.C. 1681c(g); Credit and Debit Card Receipt Clarification Act (the "Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565 (2008). Congress specifically went on to find that "[e]xperts in the field agree that proper truncation of the card number, by itself as required by the [FCRA], regardless of the inclusion of the expiration date, prevents a potential fraudster from perpetrating identity theft or credit card fraud." *Id.*, at 1566.

FACTA, like the PCI DSS, recognized the significance of restricting access to financial account numbers. A wrongdoer could access a consumer's credit report because they know the consumer's date of birth and/or social security number or by simply stealing a consumer's mail. If

a wrongdoer improperly retrieves a consumer's credit report containing full, untruncated account (or card) numbers, the wrongdoer will have access to all the information necessary to access the funds (or credit lines) in those accounts. However, if a wrongdoer accesses a consumer's report and finds truncated account numbers, to find the full account (or card) number would require interaction with the financial institution holding the account, greatly reducing the likeliness of successful theft.  While said wrongdoer may have access to other information in that consumer's file, the information to which they would have access, such as payment histories or the dates an account was opened or closed, will be unhelpful to their criminal endeavors. Equifax's truncation of account numbers similarly acts to protect the privacy interests of consumers.

Additionally, numerous states have passed consumer protection laws that focus on the privacy of consumer personal and financial information. The California Consumer Privacy Act of 2018 ("CCPA") requires that business follow certain standards and practices when handling consumer information. *See* Cal. Civil Code § 1798, et seq. CCPA applies to entities who do business in California and meet other criteria such "[d]eriv[ing] 50 percent or more of its annual revenues from selling or sharing consumers' personal information." Cal. Civ. Code § 1798.140(b). Under the CCPA, businesses are required to limit the use and disclosure of consumer information. Equifax, an entity that does business in California, is subject to the CCPA and must abide by its requirements for handling private consumer information. Although the truncation of account numbers is not expressly mentioned in the text of these laws, it aligns with the great need for data protection. Truncating account numbers is one of many ways in which Equifax complies the consumer protection laws of California.  Many other states, such as New York, Massachusetts, Maryland, and Virginia have similar laws protecting against inadvertent disclosure of consumer financial and personal information. *See* Stop Hacks and Improve Electronic Data Security

(SHIELD) Act, S. 5575B, 2019 Leg., 2019-2020 Reg. Sess. (Ny. 2019) ("[The SHIELD Act] requires reasonable data security, provides standards tailored to the size of a business, and provides protections from liability for certain entities."); 209 Code of Mass. Reg. 40.00 ("Unfair or deceptive acts or practices in or affecting consumer transactions are unlawful"); Md. Code Regs. 31.16.08 ("Describes conditions under which a licensee may disclose . . . nonpublic personal financial information about individuals to affiliates and nonaffiliated third parties"); Va. Code Ann. tit. 59.1, Ch. 53 (providing consumers with health and financial data privacy protections).

In 2010, the National Institute of Standards and Technology as set by the U.S. Department of Commerce formally opinioned that "an individual's SSN or financial account number is generally more sensitive that an individual's phone number or zip code," recognizing the information as sensitive data field  encompassed within the "personally identifiable information," or PII, and encouraging organizations on ways to safekeep such information. *See* Guide to Protecting the Confidentiality of Personally Identifiable Information (PII), Recommendations of the National Institute of Standards and Technology (NIST), Special Publication 800-122, April 2010. *NIST SP 800-122, Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)*. https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-122.pdf

In contrast, Plaintiff's Complaint relies on a 25 year old, informal, non-binding, FTC staff opinion.  *See* Complaint. The Court in *Whitaker v. Trans Union Corp.* reviewed similar claims regarding this same Advisory Opinion, and determined that "as a matter of law, scrambling or truncating a consumer's account number is a reasonable procedure to protect the consumer's information from potential identity theft." 2005 WL 8160827, *20 (D. Kan. Feb. 3, 2005). The guidance in *Whitaker* is analogous and instructive and provides prudent guidance for resolving the instant matter. Indeed, Judge VanBebber was rightfully not persuaded by the plaintiff's allegations

there, and correctly opined that "holding a credit reporting agency liable for a scrambled or truncated account number that a creditor furnished would lead to absurd results. . ." *Id.* The court properly recognized the truncation as a reasonable effort to protect consumers' information from potential identity theft, which was, and remains, a primary concern of Congress.

At least one court recently reviewed similar allegations in *Laguerre Lesendro v. Trans Union, LLC*, No. 2:25-cv-128 (D. Conn. Apr. 14, 2025), wherein, upon application for *in forma pauperis*, the pro se Plaintiff alleged Trans Union's inaccurately reported his account number as "incomplete" because it was "missing the last 4 digits." 2025 WL 1104611, at *6 (D. Conn. Apr. 14, 2025). Upon review of the Plaintiff's in forma pauperis application, the court *sua sponte* dismissed the action, ruling that:

> Plaintiff alleges no facts which could show that the information and the manner in which it is conveyed make the report 'patently incorrect or . . . misleading in such a way and to such an extent that it can be expected to have an adverse effect,' *Mader*, 56 F.4th at 269 (quoting Shimon, 994 F.3d at 91). Moreover, with respect to the account information, the omission was for the purpose of protecting consumers such as the plaintiff. See, e.g., Compl. (Pl. Ex. 3) at 52 ("For your protection, your account numbers have been partially masked . . . ").

*Id.*

In short, Congress, the courts, the  government, and a majority of the states have made it a priority for companies that maintain sensitive consumer information to take steps to prevent unauthorized individuals from accessing that same information. Truncating account numbers is a reasonable step to prevent fraud against individuals, as noted by all of the above authorities. While the express language of the FCRA does not require truncating account numbers, its overall focus on consumer protection needs to be considered in its interpretation. Any other interpretation is an invitation to frivolous claims flooding the court system, as Congress specifically noted in its comments to the Clarification Act. And, as understood by the Third Circuit, for example, the

-12-

truncation of account numbers alone does not make the information inaccurate or unclear, especially when the tradelines are read as a whole. *See Bibbs*, 43 F.3d 343-344.

**C.    Courts Should Interpret The Requirements Of The FCRA Consistent With Consumer Reporting Agencies' Obligations Under Voluminous Other Privacy Regulations**.

Because one of the primary stated purposes of the FCRA is that CRAs, like Equifax, "exercise their grave responsibilities with fairness, impartiality and a respect for the consumer's right to privacy," *see* FCRA Section 1681(a)(4), compliance with the FCRA needs to be viewed in the same light as the CRAs' responsibilities under the many aforementioned privacy laws and regulations. As described in detail above, numerous entities, including CRAs, are regulated with the amount of information that they can publish – and many such laws are directed at the account numbers of consumers. *See supra,* Section A. The protection of consumers' credit and financial information is paramount in avoiding the epidemic of identity theft and many other forms of financial fraud. The FCRA should be interpreted similarly to allow CRAs to take steps to ensure the protection of consumer privacy.

Section 1681g of the FCRA needs to be read in light of the goals of protecting consumer privacy. Section 1681g states that a CRA should provide to a consumer "[a]ll information in the consumer's file at the time of the request," but that does not include every digit, letter, or punctuation that may be connected to the consumer's file – especially information that does not bear on the substance of the credit information recorded. *See Shaw v. Experian Info. Solutions, Inc.*, 891 F.3d 749, 761 (9th Cir. 2018).

The Federal Trade Commission ("FTC")[3] interpreted the term "file" in 15 U.S.C. § 1681g to be limited to material included in a consumer report that would be sent to a third party. *See* 40

---

[3] The interpretation and enforcement of the FCRA transferred from the FTC to Consumer Financial Protection Bureau ("CFPB") after passage of the Consumer Financial Protection Act of 2010. In preparation for the transition, in July 2011, the FTC published "40 Years of Experience

Years Commentary, p. 71. A credit "file" for purposes of § 1681g means "information included *in a consumer report*,"[4] and does not include every piece of information that a consumer reporting agency has on a consumer. *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 910 (7th Cir. 2007) (emphasis supplied); *Wimberly v. Experian Info. Sols., Inc.*, 2019 U.S. Dist. LEXIS 218104, at *24 (S.D.N.Y. Dec. 17, 2019) (discussing the expansive and narrow definitions of "file" and expanding *Gillespie*, holding that internal record relating to a CRA's processing of information are not a part of the "file"); *see also Shaw*, 891 F.3d at 761. The Committee intends this language to ensure that a consumer will receive a copy of that consumer's report, rather than a summary of the information contained therein").  *Gillespie* cites the FTC's commentary on §1681g(a)(1) regarding the limited scope of the term "file": "[t]he term 'file' denotes all information on the consumer that is recorded and retained by a consumer reporting agency that might be furnished, or has been furnished, in a consumer report on that consumer." *Id.* at 909 (quoting 16 C.F.R. pt. 600, app. § 603). "Congress, it seems, chose to limit the right to contest information to material *actually contained in consumer reports*.

A strict reading of statutory language does not preclude an interpretation of that language – even within the FCRA.  "[It is a] fundamental canon of statutory construction that the words of a statute be read in their context and with a view to their place in the overall statutory scheme."

---

with the Fair Credit Reporting Act – An FTC Staff Report with Summary of Interpretations" ("40 Years Commentary") (available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summaryinterpretations/110720fcrareport.pdf) (last accessed 10/21/2025). The CFPB has not issued any contrary interpretation and has cited the 40 Years Commentary in amicus briefs on other topics. *See Moran v. The Screening Pros, LLC*, 9th Cir. Cause No. 12-57246 10/4/13, Dkt. 22.

[4] The FCRA defines the term "consumer report" to mean "any written, oral, or other communication of any information by a consumer reporting agency *bearing on a consumer's credit worthiness*…which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit." 15 U.S.C. § 1681a(d)(1)(A))(emphasis supplied).

*King v. Burwell*, 576 U.S. 473, 492 (2015) (quoting Utility Air Regulatory Group v. E.P.A., 573 U.S. 302 (2014)). For example, while the FCRA requires that CRAs "shall follow reasonable procedures to assure maximum possible accuracy of the information," *see* 15 U.S.C. Section 1681e(b), Courts have held that "maximum possible accuracy" does not mean complete accuracy, as the concept of "maximum" is elusive. *See, e.g.*, *Bibbs v. Trans Union LLC*, 43 F.4th 331, 344 (3d Cir. 2022). Likewise, "all information" is not necessarily every single digit of each account number – but rather a reasonable provision of all substantive information in the consumer's file produced in a manner that reasonably protects against identity theft and other fraud and provides the consumer with enough identifying information to dispute the account with the CRA. Considering the Court rulings that the FCRA's language to not require a strict and unnuanced reading of the statute, the FCRA's stated purpose in protecting consumer privacy, and the litany of both state and federal statutes and regulations that seek to limit exposure of consumer information by redaction of account numbers, CRAs should not be deemed to have violated Section 1681g by truncating account numbers. Consumers, like Plaintiff, have enough information, especially when their own financial records are considered, to review their consumer disclosures and identify and review their credit accounts.  Equifax's Motion should be granted.

**D.     Plaintiff's Allegations Are Conclusory And Fail To State A Claim Upon Which Relief Can Be Granted.**

Even if truncating account numbers for the benefit of Plaintiff's privacy could constitute a violation of the FCRA, Plaintiff has failed to allege an injury and a causation of that injury in anything but a wholly conclusory fashion.  As such, the Complaint should be dismissed.  *See Iqbal*, 556 U.S. at 678 (a plaintiff must plead a "plausible claim for relief" – one where the claim affirmatively shows "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

The FCRA is not a strict liability statute, but Plaintiff's bare bones allegations of pointing to (naturally) blank fields in a credit file, do not lay out the factual allegations necessary to state a claim. *See Pettus v. TRW Consumer Credit Serv.*, 879 F. Supp. 695, 697-98 (W.D. Tex. 1994) (finding proof of damages to be an essential element of an action under the FCRA because the statute is not meant to impose strict liability for errors). Plaintiff's Complaint simply identifies what he perceives to be deficiencies in his credit file, and says without further allegations that such omissions were "emotionally distressing" and "confusing." These are "legal conclusions masquerading as factual conclusions [and do] not suffice to prevent a motion to dismiss." *Taylor*, 296 F.3d at 378. Nowhere in Plaintiff's Complaint are any well-pleaded allegations regarding *how* he was confused. He does not allege, for example, that he has multiple Capital One Auto Finance Accounts which are charged off with a balance of $43,153 such that he could not tell which account Equifax was reporting regarding him. He does not allege *how* such confusion (even if plausible per *Iqbal*), actually caused him emotional distress, beyond simply stating it was distressing.

Separate and apart from the account truncation issue, Plaintiff alleges that Equifax omitted "information like the payment history, account opening dates, dates of last activity, credit limits, and original loan amounts" for fourteen accounts. ECF No. 1 at ¶ 14. Notably, Plaintiff's Complaint is completely devoid of any factual allegations that unidentified and "incomplete" information even exits. Indeed, a review of Plaintiff's Equifax credit file (Exhibit A to the Complaint) shows there is no omission of data that Equifax otherwise possesses. Rather, the exhibit shows that Equifax informed Plaintiff that "Payment history is provided, **where available**, for each account." ECF No. 1-2 at Ex. A, p. 2 of 18 (emphasis supplied). Likewise, various spots on Plaintiff's credit file do not contain information, and the key provides that for those sports there is "No Data Available."

Plaintiff does not allege what *should* be in those spots, or how Equifax's statement that no data is available for those months is inaccurate, other than the conclusory allegation that he believes that information is maintained by Equifax. *See* ECF No. 1 at ¶ 23. Equifax cannot report information which has not been provided or does not exist. Plaintiff simply identifying a blank line on a credit disclosure, and alleging a violation of Section 1681g, does not rise to the level of plausibly alleging that information is missing in violation of the FCRA. Rather, not every account will have relevant information for every possible field on the credit report.

Plaintiff's allegations, which contradict his own exhibit, are nothing but conclusory allegations or legal allegations masquerading as factual allegations, which this Court does not need to accept as true for purposes of Equifax's Motion. Plaintiff has not done anything to move his allegations from merely possible to plausible.

**E.    Case Law Holds That Equifax Cannot Have Acted With A Conscious Disregard Of Plaintiff's Rights Pursuant To The FCRA Because Its Actions Were Necessitated By Its Compliance With Other Privacy Laws**.

Even if Plaintiff could show that Equifax violated the FCRA by truncating account numbers on his consumer disclosure, which he cannot, Plaintiff's claim would still fail because Plaintiff has not sufficiently alleged actual damages or willful conduct. An FCRA plaintiff must show either actual damages or a willful violation to state a claim. *See Ferrarelli v. Federated Fin. Corp. of America*, No. 1:07cv685, 2009 WL 116972, *7-8 (S.D. Ohio Jan. 16, 2009) (holding that the burden of proof of causation of damages lies with plaintiff). That is because the FCRA permits statutory damages only for willful violations and limits damages for negligent violations to the "actual damages sustained by the consumer." *See* 15 U.S.C. §§ 1681n and 1681o.

Plaintiff has not alleged, and cannot allege, any evidence of willfulness, as is required to state a claim for entitlement to statutory and punitive damages under the FCRA. *See* 15 U.S.C. § 1681n. To prove willfulness, Plaintiff carries the heavy burden of showing that Equifax

-17-

knowingly and intentionally committed an act in conscious disregard for Plaintiff's rights.[5] *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57-58 (2007). In addition, only defendants who engaged in willful misrepresentations have committed a willful violation of the FCRA and are subject to liability under §1681n. *See Stevenson v. TRW, Inc.*, 987 F.2d 288, 294 (5th Cir. 1993); *see also Cushman v. TU Corp.*, 115 F.3d 220, 227 (3d Cir. 1997). A violation based on an erroneous but objectively reasonable reading of the FCRA is not willful. *See Sherman v. Sheffield Fin., LLC,* 627 F. Supp. 3d 1000, 1018 (D. Minn. 2022). A company cannot be said to have willfully violated FCRA if the company acted on a reasonable interpretation of FCRA's requirements. *See Kelly v. RealPage, Inc.*, 539 F. Supp. 3d 374, 378 (E.D. Pa. 2021). Similarly, acting in the best interests of the consumer cannot reasonably be said to be acting contrary to or with "reckless disregard" to those interests. *Safeco*, 551 U.S., at 52.

As outlined above, Equifax's truncating of Plaintiff's account numbers is not done with a disregard for the consumer's rights, but rather with the intent to *protect* consumers' rights to privacy and to avoid identity theft. *See supra*, Section III(A).  And importantly, the primary purpose of the FCRA is to protect consumer privacy. *See* 91 Cong. Rec. H.R.15073 (1970). Plaintiff cannot allege, and has not alleged, that Equifax acted with a conscious disregard of his rights by truncating account numbers when such is done to protect that consumer's privacy and comply with other laws. Thus, Plaintiff cannot plausibly claim that Equifax willfully violated the FCRA and Plaintiff's willful violation of the FCRA claim should be dismissed.

**E.    Case Law Holds Plaintiff Cannot Prove A Negligent Violation Of The FCRA Because Plaintiff Does Not And Could Not Have Actual Any Damages In Connection With Receiving Truncated Account Information**.

---

[5] According to *Safeco*, conduct is reckless if it is a violation under a <u>reasonable</u> reading of the FCRA's terms <u>and</u> the conduct presents an unjustifiably high risk of violating the FCRA that is so obvious that the defendant should have known its conduct violated the law.  *See Safeco*, 551 U.S. at 69-70.

In order to allege an FCRA negligence claim, Plaintiff must plausibly allege that a defendant's alleged violation caused his injury. *Id*. at 701. *See Ferrarelli*, 2009 WL 116972, *7-8 ("An FCRA plaintiff [must] produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a 'substantial factor' that brought about the denial of credit.")

Plaintiff does not allege that any third party received his consumer disclosure or that Plaintiff suffered any harm because Equifax provided him with truncated account numbers on his consumer disclosure. *See* ECF No. 1, generally. Rather, Plaintiff's alleged damages are limited to alleged suffering of emotional distress because he received "incomplete" account numbers, which "undermined his ability to detect and correct inaccuracies" and therefore somehow suffered "reputational" harm. *Id*. at ¶ 17. Setting aside the speculative and conclusory nature of these damages allegations, there can be no "reputational" harm when he was the only person alleged to have received such a confusing disclosure was Plaintiff himself. [6]

Case law holds that a consumer cannot, as a matter of law, recover for emotional distress for a CRA reporting inaccurate (or incomplete) information unless that information was provided to a third party. *See, e.g.*, *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 475 (2d Cir. 1995); *Garrett v. Trans Union, LLC*, No. 2:04-CV-00582, 2006 WL 2850499 (S.D. Ohio Sept. 29, 2006); *Haddad v. Charles Riley & Assocs.*, No. 09-12597, 2010 WL 3905861 (E.D. Mich. Sept. 30, 2010).

The same theory precluding emotional distress for provision of inaccurate information should reasonably extend to the provision of incomplete information. If a consumer cannot recover emotional distress damages for a consumer disclosure stating objectively false information to that consumer but not to third parties, a consumer cannot recover for receiving truncated account

---

[6] Actually, Plaintiff's consumer file was provided to third-parties via his filing it publicly in this lawsuit. Any "reputational" harm as a result of dissemination of Plaintiff's poor credit history is caused not by Equifax, but by Plaintiff.

numbers (or incomplete information) that was not provided to third parties. Accordingly, because consumer disclosures, by definition, are only provided to him, Plaintiff cannot recover for any emotional distress damages. Thus, Plaintiff's negligent FCRA claim should be dismissed.

## IV.    CONCLUSION

In light of the foregoing, Equifax respectfully request that the Court grant its Motion. The dismissal should be with prejudice as any amendment would be futile. *See Norton v. Wells Fargo Bank, N.A.*, No. 4:19-CV-00001-O-BP, 2019 WL 3937142, at *7 (N.D. Tex. Aug. 2, 2019) (citing *Cal Dive Int'l, Inc. v. Schmidt*, 639 Fed. App'x 214, 219 (5th Cir. 2016) (explaining that "where [a]n amendment would be futile [because] . . . the complaint as amended would be subject to dismissal," then it should be dismissed with prejudice) (internal citations omitted). Plaintiff cannot plead any plausible factual allegations which would give rise to a right to relief, because the facts Plaintiff admits show there is no liability. Plaintiff acknowledges he asked for and received his consumer disclosure from Equifax.  It is therefore impossible for Plaintiff to show Equifax had any liability under these facts. As such, Plaintiff's Complaint is incurably flawed and any amendment would be futile and the Complaint should be dismissed with prejudice.

DATED:  January 5, 2026                Respectfully submitted,

                                        SEYFARTH SHAW LLP


                                        By:  */s/ Ritika Singh*
                                        _____
                                             Ritika Singh, *Admitted Pro Hac Vice*
                                             risingh@seyfarth.com
                                             SEYFARTH SHAW LLP
                                             2323 Ross Avenue, Suite 1660
                                             Dallas, Texas  75201
                                             Telephone:  (469) 608-6763

                                             *Counsel for Defendant*
                                             *Equifax Information Services LLC*

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that counsel for Equifax Information Services LLC conferred with *Pro Se* Plaintiff on December 30, 2025 regarding the substance of the relief sought in Defendant Equifax Information Services LLC's Motion for Judgment on the Pleadings and Memorandum in Support. Plaintiff opposes this motion.

*/s/ Ritika Singh*
Ritika Singh
*Counsel for Defendant*
*Equifax Information Services LLC*

322320543v.1

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2026, I presented the foregoing DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS AND MEMORANDUM IN SUPPORT with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.  A copy has also been sent via U.S. Mail to the following:

> Morris Williams, *plaintiff pro se*
> P.O. Box 114
> Hockley, Texas  77447
> Email:  travel12003@yahoo.com

> */s/ Ritika Singh*
> Ritika Singh
> *Counsel for Defendant*
> *Equifax Information Services LLC*

322320543v.1